IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LIVE NATION MERCHANDISE, INC.,

       Plaintiff,                        Case No.: 4:18-cv-00660

vs.

VARIOUS JOHN DOES,
VARIOUS JANE DOES,
and ABC COMPANY,

       Defendants.

**DECLARATION OF PETER WEBER IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER, SEIZURE ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION AND SEIZURE ORDER SHOULD NOT ISSUE**

I, Peter Weber, hereby declare as follows:

1. I make this declaration in support of Live Nation Merchandise, Inc.'s ("Plaintiff") ex-parte application for: a temporary restraining order; seizure order; and an order to show cause why a preliminary injunction and seizure order should not issue in this matter to halt the sale of, and to seize, infringing merchandise bearing the federally registered trademarks, service marks, likenesses, logos and other indicia of the musical performers "U2" (the "Group") when they perform on May 4, 2018 at the Scottrade Center in St Louis, Missouri and thereafter during their tour. Similar orders have been previously granted by this District to other musical performers, as well as by other Districts for this Group and other musical performers. See Certificate of Counsel and Exhibits thereto, including for this Group including: Live Nation Merchandise v. Does, Case No. 17-CV-1502

1

(S.D. TX 2017) (Judge Harmon) (for U2's tour); <u>Live Nation Merchandise, Inc. v. Does, et al.</u>, Case No. 11-cv-1297 CMA (D. CO 2011) (Judge Arguello) (for U2's tour); <u>Live Nation Merchandise, Inc. v. Does,</u> Case No. 09-11489 RWZ (D. MA 2009) (Judge R. Zobel) (for U2's tour); <u>Signatures Network, Inc. v. Does,</u> Case No. 05-2106 ABC (C.D. CA 2005) (Judge Collins) (for U2's tour); and <u>Signatures Network, Inc. v. Does,</u> Case No. 01-D-514 (D. CO 2001) (Judge Daniel) (for U2's tour).  I have personal knowledge of the facts set forth herein and am authorized by Plaintiff to make this declaration.  If called as a witness, I could and would be able to testify competently to such facts.

      2.      Plaintiff is engaged in the business of manufacturing, distributing and selling authorized merchandise such as T-shirts, sweatshirts, and posters, among other merchandise (collectively "Merchandise").  Plaintiff has obtained the exclusive right to distribute Merchandise (collectively "Authorized Tour Merchandise") at all of the Group's concerts in the United States and elsewhere (the "Tour") bearing the federally registered trademarks, service marks, likenesses, logos and other indicia of the Group (collectively the "Group's Trademarks").  A true and correct copy of the Group's current Tour itinerary of announced dates is attached as Exhibit A and is incorporated by this reference as though fully set forth herein.

      3.      I am Senior Vice President of Tour and Event Operations for Plaintiff.  I have been employed by Plaintiff and its predecessors (including Signatures Network, Inc. and Sony Signatures, Inc.) for approximately 20 years. Prior to that, I worked on merchandising of tours for specific performers.  I am responsible for the merchandising and security on the Tour.  I have personally worked for and/or supervised merchandising

and bootleg security on over 70 musical tours, including the prior U2 tours set forth in paragraph 1 above.

  4. "U2" is the trademark for one of the most prominent musical performing groups, in commercial use for over 40 years.  Formed in 1976, the Group has released 15 albums and are one the world's best-selling musical groups of all time, having sold over 150 million units of recordings worldwide.  The Group's well-known albums include: "Joshua Tree" (over 25 million units sold); "Rattle and Hum;" "Actung, Baby;" "All That You Can't Leave Behind;" "War;" "Under A Blood Red Sky;" and the "Unforgettable Fire."  The Group's well known songs include: "With or Without You;" "One;" "Mysterious Ways;" "Still Haven't Found What I'm Looking For;" "In the Name of Love;" "New Year's Day;" "Sunday Bloody Sunday;" and "Beautiful Day."  The Group has won 22 "Grammy" awards – more than any other musical group- out of 34 nominations, which are awarded by the National Association of Recording Artist and Sciences.  These include for Record of the Year, Album of the Year, Song of the Year, Best Rock Album, Best Rock Duo or Group. The Group has also been nominated for and won numerous other music related awards, including American Music Awards, and MTV awards. In 2005, the Group was inducted into the Rock and Roll Hall of Fame in their first year of eligibility.  They have appeared on the covers of, or in articles appearing in, hundreds of newspapers and magazines throughout the United States, including being the fourth rock band to be on the cover of Time Magazine, as well as in the San Francisco Chronicle, New York Times, Wall Street Journal, and Forbes.  The Group's performances are broadcast throughout the United States on television programs such as on the 200th episode of the popular television show "The Simpsons" (in cartoon form), at the Super Bowl Halftime Show in 2002 (the most

3

watched program in the US that year), the Today show, Saturday Night Live and others. The Group's performances are also broadcast on cable stations such as MTV and VH1. The Group has been nominated for 5 Golden Globe awards for their recordings use in motion pictures distributed nationwide including winning two for the songs "Ordinary Love" written in honor of Nelson Mandela for the movie "Mandela Long Walk to Freedom" (also nominated for an Academy Award) and "The Hands That Built America" in 2003 from the movie "Gangs of New York." The Group has raised millions of dollars for philanthropic groups, including performing at Live Aid and performances and recording to raise funds for victims of 9/11, Hurricane Katrina and Hurricane Rita.

5. The Group has obtained Federal Trademark Registrations for their **U2** trademarks: Federal Registration No. 1550756 for use in connection with International Class ("IC") 25 clothing, IC 16 paper goods and printed matter, and IC 9 phonograph records and pre-recorded audio tapes (*incontestable*); Federal Registration No. 1820220 for use in connection with IC 41 for entertainment services *(incontestable)*; Federal Registration No. 4430881 for use in connection with IC 9 recording apparatus, and IC 15 for musical instruments; and Federal Registration No. 4434737 (design)



for use in connection with IC 25, clothing. Some of these marks are incontestable as noted.

6. This Tour is highly anticipated, so many of the Group's concert dates are sold out or almost sold out. Because of the Group's status among popular music

4

enthusiasts, the Tour is expected to be a very successful and Plaintiff anticipates that other dates will be added to the current itinerary.  The Tour involves many large-capacity venues, i.e., arenas seating in excess of 10,000 people. Income from the sales of Authorized Tour Merchandise is expected to be very substantial.

7. The Group derives income and promotes their image in part from sales of recordings and live performances, and in part through the sale of merchandise associated with him.  Plaintiff and the Group spend a great deal of care, time and money developing merchandise associated with the concert tours.  Care is taken that the Authorized Tour Merchandise bearing the Group's Trademarks is of a high quality and are appropriate to their image.

8. Concerts by the Group, and other performers of their stature have recurring problems with individuals who sell infringing Tour Merchandise near, at and sometime inside a concert venue.  These individuals are referred to as "Bootleggers," their activities are known as "Bootlegging" and their goods are referred to as "Infringing Merchandise" or "Bootleg Merchandise."

9. During the last five prior tours by this Group, as well as every prior tour by performers of the caliber and following of this Group, Defendant Bootleggers have appeared selling their Infringing Merchandise from the very beginning of the tour.  In order to combat this on the five prior tours for this Group and other similar tours, Plaintiff and other merchandisers have obtained temporary restraining orders and seizure orders, and thereafter preliminary injunctions and nationwide seizure orders to seize the infringing merchandise from the Defendant Bootleggers.  True and correct photographs of examples of Bootleggers selling their Infringing Merchandise and examples of the actual Infringing

Merchandise seized pursuant to previously issued Seizure Orders during the two prior U2 tours are attached hereto as Exhibit B.  See also Certificate of Counsel of Cara R. Burns, filled herewith, and its Exhibits.

10. In my extensive experience, including with this particular Group's five prior tours, each of which was heavily bootlegged from the very beginning of the tour, the Bootlegging problem has grown with the popularity of popular music tours.  In virtually every instance, the Defendants sell identical shirts, indicating that they are supplied from a common source.  Individual Bootleggers are recognized at many venues as they follow the tours, or they arrange to have local individuals sell the Infringing Merchandise for them.

11. We usually see a few similar designs being sold by the Defendants throughout the tour.  Many designs also have some of all of the tour dates on them, this indicates that they will continue to go from venue to venue and sell their Infringing Merchandise. These facts show that the Defendants are working together since there are hundreds of thousands of images of the Group and designs associated with them available on the internet for someone to use in their Infringing Merchandise, yet usually the same or substantially similar designs repeatedly appear on the Infringing Merchandise sold during a tour.

12. In the present circumstances, given the Group's popularity, it is not difficult to understand the motives of the Defendants. All of the concerts on this Tour are expected to be sold out or nearly sold out.  The Group will perform before hundreds of thousands of people by the Tour's end.  The fans attending the various concerts frequently seek to purchase a souvenir, such as a T-shirt.  Defendant Bootleggers are typically located outside the concert venues and therefore have the first and last opportunity to make these sales. Further some Defendants sell their Infringing Merchandise inside the venues.

6

13. Without the order we seek, when members of my staff inform the Defendants that they are selling Infringing Merchandise, they usually just walk away and/or continue to sell the Infringing Merchandise. The Defendants do not respond when we ask for their names.  All Defendants Bootleggers ignore our requests to stop selling Infringing Merchandise.  The Defendant Bootleggers respond that they want to see our "injunction" or "order" or else they will not stop their unlawful activities.  From the nature and context of their statements, it is obvious that the "injunction" or "order" they refer to is a search, seizure and impoundment order that we seek from this court.   The Infringing Merchandise they were selling and offering for sale had the places where the tour would be performing. The Infringing merchandise contained the trademarks, as well as designs, images and logos of the tour which are exclusively licensed to Plaintiff to be sold at venues.

14. Bootlegging activities greatly injure musical performers, including the Group, and legitimate merchandisers, including Plaintiff, in several ways.  The Defendant Bootleggers are not bound by contract to provide first-quality apparel and graphic designs, as is required of Plaintiff.  Further, the Defendant Bootleggers can drastically undersell us, a legitimate merchandiser, because, unlike Plaintiff, Defendant Bootleggers have no obligation to pay the Group royalties and or pay any part of their sales to the concert venue. This ability to undersell the legitimate Authorized Tour Merchandise is also enhanced by the fact that Defendant Bootleggers do not collect or pay sales or other taxes.

15. The consumer, the fans of the Group also suffer.  Infringing Merchandise is an inferior imitation which rarely lasts very long. The quality of the T-shirts and the designs are poor; many T-shirts appear to be seconds and the colors on the designs tend to "run" or "bleed" into each other. The fans are disappointed and, in their confusion as to the source

7

of the Infringing Merchandise, blame the performers. This affects future legitimate sales and also tends to create a negative feeling by the fans directed against the performers, which may in turn cause decreased record sales and concert attendance.

16. The Defendants' Infringing Merchandise is intended and will cause the general public to believe that their Infringing Merchandise is authorized, approved and sponsored by the Group. Consequently, not only does the sale of this Infringing Merchandise violate Plaintiff's exclusive rights, but also causes the general public to be adversely affected and irreparably harms Plaintiff's and the Group's reputations for excellence and integrity in the legitimate Authorized Tour Merchandise.

17. The unchallenged presence of Defendant Bootleggers in our marketplace severely damages the market and Plaintiff's business at every level. The precise damage to Plaintiff is incalculable. The Infringing Merchandise sells for approximately half the price (or less) of the genuine Authorized Tour Merchandise and the people involved in the illegal merchandising activities keep no records. On the basis of my past experience with such Defendants, I believe these Defendants would dispose of or destroy any Infringing Merchandise or related documents should legal proceedings be commenced against them. Further, the incalculable damage caused by the Defendants deprives the rightful owners of their return. Accordingly, we seek to curtail the Bootlegging activities of the Defendants by are seeking the assistance of this Honorable Court to obtain an order allowing the seizure of Infringing Merchandise.

18. The people who serve the orders and seize infringing merchandise consist predominately of off-duty law enforcement officers who are well versed and trained in seizing infringing merchandise. They will seize only the infringing merchandise and

provide receipts.  They *do not* make arrests, as it is a civil seizure order.  The objectives are to serve the restraining and seizure order, preserve the infringing merchandise, see if Defendant Bootleggers will provide contact information (which they rarely provide), and provide a receipt, then move onto the next bootlegger.

19.  I believe the difficulties in identifying the Defendants, including that they have no fixed place of business or assets, makes them virtually immune to normal process or to any process except by way of restraining order against persons unknown to allow the seizure of the Infringing Merchandise pending a final disposition by this Honorable Court.

20.  Plaintiff is a substantial and successful business and will be able to meet any order made to compensate and any defendant for any damages suffered by as a result of any order obtained on our behalf.  However, in my experience, no Bootlegger has ever appeared at an order to show cause hearing or sought relief in the countless number of nationwide seizure orders.  Plaintiff also requests that it be appointed substitute custodian for the unlawful merchandise it requests the Court to permit it to seize.

21.  In short, absent protection from the courts in the form of a seizure order, the Defendants have an insurmountable advantage over the performers and legitimate merchandisers who obtain the right to use performers' trademarks, service marks, likenesses, logos and related rights.  Left unprotected, merchandisers will be unable to offer performers appropriate sums for these rights.  This in turn limits the performers' ability to stage unique and exciting concerts for their fans.   The injury affects the Group, the exclusive licensee (Plaintiff), and the fans.

I declare under penalty of perjury under the laws of the United States and the state of Missouri that the foregoing is true and correct. Executed April 27, 2018.

_____
PETER WEBER